Laurence F. Padway, #89314
LAW OFFICES OF LAURENCE F. PADWAY
1516 Oak Street, Suite 109
Alameda, California 94501
Telephone: (510)814-6100
Facsimile : (510)814-0650

Attorneys for Plaintiffs
RITA MOHLEN and RICHARD SKRINDE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RITA MOHLEN and ,<br>RICHARD SKRINDE<br><br>            Plaintiffs,<br>      vs.<br><br>CITY OF ALAMEDA, GREGORY<br>McFANN, and GREGORY FUZ,<br><br>            Defendants.<br>_____/ | Case No. C 03 3162 CW<br><br>**STIPULATION TO FILE<br>SECOND AMENDED<br>COMPLAINT AND (Proposed)<br>ORDER** |

On August 31, 2005, plaintiffs filed their First Amended Complaint in this action;

Counsel for plaintiffs has advised counsel for defendants that, as a result of clerical error, the First Amended Complaint contains typographical and grammatical errors which plaintiffs desire to correct;

The parties therefore stipulate that plaintiffs may file the attached Second Amended Complaint. Defendants to have 30 days from the filing of the Second Amended Complaint to file a responsive pleading.

Stipulation to Amend                         Page 1 of 3

1    By electronically filing this document, the filer attests that concurrence in the filing of

2  the document has been obtained from each person whose electronic signature appears hereon.

3

4  DATED: October 7, 2005

5

6  _____
   Laurence F. Padway

7  Attorney for plaintiffs

8

9

10

11 _____
   Gregory M. Fox

12 Bertrand, Fox and Elliot
   Attorney for defendants

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stipulation to Amend                    Page 2 of 3

1  Laurence F. Padway, #89314
   Law Offices of Laurence F. Padway
2  1516 Oak Street, Suite 109
   Alameda, California 94501
3  Telephone: (510)814-0680
   Facsimile : (510)814-0650
4

5  Attorneys for plaintiff
        Rita Mohlen and
6       Richard Skrinde

7

8

9
                  UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11

12  RITA MOHLEN and                    No.  C 03 3162 CW
    RICHARD SKRINDE,
13                                      [Proposed]
                                        SECOND AMENDED COMPLAINT
            Plaintiffs,                 FOR VIOLATION OF CIVIL
14                                      RIGHTS
        vs.
15
    CITY OF ALAMEDA, GREGORY
16  McFANN, and GREGORY FUZ,

17          Defendants.
    _____/
18
            Come now plaintiffs, demanding trial by jury and alleging of defendants and each of
19
    them as follows:
20

21
                              **Jurisdiction**
22

23
            1.  This action is brought under 42 U. S. C. 1983 for deprivation of civil rights under
24
    color of state law.  Jurisdiction in this court is premised on 28 U.S.C. 1343.
25

26

27

28

Second Amended Complaint              Page 1 of 21

**Summary**

2.  Plaintiffs purchased their home in Alameda along the Oakland estuary in 1994. The home then had an attached dock, boat house and boat hoist.  Plaintiffs remodeled the house, boathouse, boat hoist and dock, complying with the then current procedures for permits and construction.

Defendant City of Alameda is a municipality in California, whose Building Official is defendant Gregory J. McFann, and whose Planning and Building Director from approximately 2002-2004 was defendant Gregory Fuz.

3.  Defendant City has created a large bureaucracy in the Building and Planning Department, which supports its size by an aggressive, illegal and arbitrarily executed building code enforcement program.  The City has for years adopted building codes which are illegal and conflict with State law, creating multiple, complex sets of rules which govern building in the City.  The City has enforced its own ordinances notwithstanding that they are all adopted in direct conflict with State law.  In order to preserve the size of its staff, defendants assess fines for alleged violations of City codes, and in that endeavor, they have cited about ten percent of the housing stock on the main island in Alameda for alleged code noncompliance.  When homeowners exercise their right to complain about City conduct or the conduct of City personnel, the City retaliates, as it did here, by abusing its power to make it fiscally impossible for homeowners to challenge the City, and by asserting an ever increasing amount of code violations, in an attempt to pressure homeowners to abandon their complaints.  Further, when homeowners are not quelled by the City's retaliation, the City has, as here, occasionally  taken to filing false criminal charges against the homeowner in an attempt to arbitrarily force their submission. All of the building code ordinances adopted by defendant City of Alameda during all of the relevant time periods in this cases were contrary to California law, void and unenforceable, as more fully described below.  Nonetheless, in retaliation against plaintiffs for

Second Amended Complaint                    Page 2 of  21

1   the exercise of their constitutionally protected rights of free speech, petition, and in denial of their

2   rights to be free from arbitrary arrest and their right to equal protection under law,  defendants

3   created a gauntlet of ever changing and arbitrary rules, regulations and interpretations for the purpose

4   of intimidating homeowners into paying unlawful fees, and submitting to the absolute and arbitrary

5   authority which defendants claim to hold.

7                    These general allegations are incorporated into each claim for relief below.

9                         FIRST CLAIM FOR RELIEF - 42 U. S. C. 1983

10                    RETALIATION FOR THE EXERCISE OF PROTECTED RIGHTS

12                                    Precipitating Events

14                    4.  Notwithstanding its legally deficient building codes, defendant City carefully

15   inspected and approved the construction done by plaintiffs on their property at 3017 Marina Drive

16   until September, 2000.  In that month, plaintiffs rebuffed the threats that City Building Inspector

17   George Carder made to them in their home, that if they did not cooperate with him the City would

18   make plaintiffs tear down their house.  Carder told plaintiffs, while rubbing his thumb and forefinger

19   together so as to suggest a solicitation of remuneration, that if they worked with him, he would

20   resolve the problems which he had just started for them.  When the plaintiffs did not comply, Carder

21   issued a stop work order on September 20, 2000, interrupting lawful remodeling work then in

22   progress.  The following day, plaintiff Richard Skrinde complained to defendant City Building

23   Official McFann concerning Carder's conduct.  This was followed by a letter sent to defendant

24   McFann from attorney Kevin Taguchi on October 23, 2000, in which Taguchi restated Skrinde's

25   allegations that Carder had acted in a threatening and unprofessional manner during the September,

26   2000 incident.  Mr. Skrinde reiterated those same complaints by letter to Alameda Mayor Ralph

27   Appezzato on January 2, 2002, and plaintiff's counsel, Gene P. LaFollette, requested an investigation

28   by Alameda Police Chief Burney Matthews in early 2002.  Defendant City immediately informed

Second Amended Complaint              Page 3 of  21

1 Carder and defendant McFann of the complaints made by plaintiffs, and defendant City immediately

2 informed defendant Fuz about the complaints it received from plaintiffs in 2002.  These complaints

3 were and are protected by plaintiffs' right to free speech, and their right to petition the government

4 for redress of grievances.

5

6                                    Retaliation Claim

7

8          5.  In retaliation for this exercise by plaintiffs of their protected constitutional rights to

9 complain, and in an attempt to cover up the misconduct by the City, defendant City began a massive

10 retaliatory code enforcement proceeding against plaintiffs.  This featured ever increasing numbers of

11 complaints of alleged code violations, growing from Carder's original list of 8 in 2000 to a zenith on

12 June 14, 2002, when defendant McFann authored a list of 88 code violations, there being essentially

13 no change in the premises during that two year period.  As plaintiffs continued to complain to

14 defendant City about its conduct, defendant City retaliated by escalating its claims of code violations,

15 and by:

16

17          i. On an unknown date but no later than October, 2000, altering its records which

18 initially had showed finaled building permits nos. B94-1183, (finaled 6/24/98), altered to reflect

19 form and footing inspections only; B-94-1261(finaled 6/28/98), altered to delete all inspections, B98-

20 1576 (finaled 9/20/00), altered to read electrical approval only,  E-98-3804 (inspected to temporary

21 occupancy 9/20/00), altered to partial electrical only,  and B-99-2548 (finaled 9/20/00), altered to no

22 approvals; and since the time of that alteration of records through early 2005, refusing to recognize

23 the final permit approvals;

24

25          ii. Constantly changing its demands as plaintiffs endeavored to comply with ever

26 increasing and changing demands for documentation, additional permits and variances.  For

27 example, in November, 2001, following four conferences between plaintiffs' architect and defendant

28 McFann concerning proposed permit submittals, architect Italo Calpestri prepared and submitted

1   plans for three permits as directed by defendant McFann.  Three weeks after this submittal,

2   defendant City refused to process the three separate permit applications it had requested because the

3   requests were not combined into a single application.  Most of the issues on these permits were not

4   resolved until 2005, and some of those issues are still not resolved;

5

6          iii.  Making agreements to release permit applications and then refusing to do so,

7   including following a meeting which included attorney Taguchi and defendant McFann in

8   November, 2000, and a later meeting between attorney Gene P. Lafollette and Assistant City

9   Manager Wonder in September, 2002;  and then demanding new permit applications so that

10  plaintiffs ultimately applied and paid multiple times for the same permits;

11

12         iv.  First demanding that plaintiff Rita Mohlen apply for variances related to a boat

13  hoist and boathouse, deck, and rear yard structures (in meetings between defendant McFann and

14  architect Calpestri in October, 2001, and in letters from Dennis Brighton to Rita Mohlen dated, inter

15  alia, April 23, 2002); but when Ms. Mohlen submitted the applications, defendant City then refused

16  to accept them instead demanding, in  writing, in 2004, that the applications be resubmitted by the

17  United States of America instead of by Ms. Mohlen;

18

19         v.  After demanding that plaintiffs obtain a license for a dock from the United States

20  Army Corps of Engineers, which the United States issued in October, 2000, demanding that the

21  license be amended, which it was in 2002 and 2003, defendant City then informed the Army in 2004

22  that the licensed use violated City ordinances, which resulted in the Army revoking the license later

23  that year.  Of the dozens of residential structures on Marina Drive and neighboring Fernside Drive,

24  the City had never required any dock other than that owned by plaintiffs to be licensed by the United

25  States Army Corps. of Engineers, despite issuing permits for docks on land owned by the USACE;

26

27         vi. First agreeing to postpone an inspection of plaintiffs' property in 2002 pending a

28  police investigation of plaintiffs' complaints and then making a surreptitious application for and

Second Amended Complaint              Page 5 of  21

1   executing an inspection warrant that defendant City caused to be issued by the Alameda Superior

2   Court in August, 2002.  The warrant application was based upon illegally adopted ordinances of the

3   City of Alameda, and was made ex parte without advising the Court that the City had agreed to delay

4   its inspection.  The warrant application was signed by defendant McFann;

5

6          vii.  Recalculating the lot coverage of the buildings on the property, and rejecting its

7   own year 2000 lot coverage calculation so as to make a previously legal building illegal;

8

9          viii.  Changing the setback rules for the property and demanding, from 2002 forward,

10  that a wall be built in the middle of a boat house so as to render it unusable, and that a second wall

11  be constructed in the middle of the Alameda estuary;

12

13         ix.  Determining in 2004, with no basis in fact, that the property, which had always

14  been considered by the City to occupy a single story, actually occupied two stories, in order to

15  declare parts of it illegal; and

16

17         x.  Filing a criminal complaint alleging 19 misdemeanors and arresting plaintiff Rita

18  Mohlen in June of 2003; all 19 counts were based on ordinances which the City had illegally adopted

19  (see discussion below of the conflicts between City ordinance and State law), and defendant City had

20  no probable cause to file the complaint.  Defendant City authorized the filing of the complaint

21  through its City Council and authorized the City Attorney to prosecute the complaint; defendant City

22  ultimately dismissed the complaint in 2004.

23

24         6.  In their continuing petition to defendant City for redress of their grievance of

25  misconduct by Inspector Carder and his retaliatory actions, plaintiffs enlisted the assistance of Kent

26  Rosenblum, who is the principal of Rosenblum Cellars in Alameda.  Dr. Rosenblum's assistance was

27  sought because of the political nature of zoning and building decisions in Alameda, and to encourage

28  the City to engage in a meaningful dialogue with plaintiffs to resolve the issues which had arisen.

Second Amended Complaint           Page 6 of  21

1   On March 6, 2003, Dr. Rosenblum wrote to the Mayor and City Council politely requesting that they

2   seek a resolution of the disputes which had arisen between plaintiffs and defendant City.  This letter

3   was immediately made known to defendants McFann and Fuz.  Defendant City and defendants

4   McFann and Fuz responded to this letter by purposefully undertaking action intended to silence Dr.

5   Rosenblum as an advocate for plaintiffs, and to that end, they dispatched Inspector Carder to

6   Rosenblum Cellars in search of code violations.  Inspector Carder did, within weeks of the receipt of

7   Dr. Rosenblum's letter by the City, cite Rosenblum Cellars for a large number of code violations,

8   causing an exposure to Rosenblum Cellars so extensive that Dr. Rosenblum declined to undertake

9   further efforts on behalf of plaintiffs.  These citations were purposefully intended to silence Dr.

10  Rosenblum, and as he has since remained silent in plaintiffs' cause, defendant City then relented on

11  virtually all of its code violation claims.  Inspector Carder had long been familiar with the

12  Rosenblum Cellar facility and had attended frequent functions there, and he had, therefore, known

13  for years of all of the alleged violations at Rosenblum Cellars, but neither he, nor other City officials

14  who had regularly inspected Rosenblum Cellars, had ever cited it for these claimed violations until

15  Dr. Rosenblum stepped forward on behalf of plaintiffs.

16

17          7.  Eric Neilsen and his company, Neilsen Electric, had done electrical work on

18  plaintiffs' residence, including work in the workshop area covered by permit E-98-3804 and B-98-

19  1596.  Mr. Neilsen had observed Inspector Hans Williams inspect and sign off the electrical work on

20  those two permits in 1998.  As part of the City's alteration of records described in 5(I), supra, an

21  inspection which Mr. Neilsen had witnessed was altered so that it no longer appeared in City records.

22  When the City complained that this electrical work had not been inspected, plaintiffs enlisted Mr.

23  Neilsen to assist them in their petition to the City to resolve that issue.  Mr. Neilsen, at the behest of

24  plaintiffs, advocated their position to the City.  In retaliation, defendant City caused Mr. Neilsen to

25  be interrogated by the Alameda Police Department in mid 2002, which threatened him with a loss of

26  his livelihood.  Further, Inspector Carder, in approximately June, 2002, asked Mr. Neilsen to forget

27  about the inspection he had witnessed, and immediately began, for the first time, referring customers

28  to him, all in an effort to subvert Mr. Neilsen from continuing to advocate for plaintiffs.  All of the

Second Amended Complaint              Page 7 of 21

1    defendants learned of these efforts by Inspector Carder shortly after they had occurred, and

2    defendants nonetheless maintained an active role for Inspector Carder in their persecution of

3    plaintiffs, thereby ratifying his conduct.

4

5        8. All of the acts of the City and its employees alleged in paragraphs 5-7 were known

6    to, authorized and/or ratified by defendant McFann, and were either directed by him, or where

7    indicated above, were directly performed by him. All of those actions which occurred in 2002 -2004

8    were known to, authorized and/or ratified by defendant Fuz.

9

10                              Discriminatory Enforcement

11

12        9. The code enforcement proceedings initiated against plaintiffs and their property, in

13    September, 2000, and which became increasingly aggressive in 2002 and 2003, were highly

14    selective, and the purpose of defendants in engaging in this discriminatory enforcement was to

15    discourage plaintiffs from complaining about the conduct alleged in paragraphs 5-8, supra, and to

16    coverup that misconduct.

17

18        10. Illustrative of the discriminatory enforcement of building and planning codes is

19    the different treatment of plaintiffs, at 3017 Marina Drive and their neighbors at 3011 Marina Drive.

20    Both properties were subject to code enforcement actions in the 2001-2002 time period. The

21    neighbors at 3011 Marina Drive had extensively remodeled a dock, deck, and large accessory

22    building, all without permits. While the City undertook investigations and code enforcement actions

23    as to both properties:

24

25        (i) A gate formed of two identical pieces joined the front of the two

26    residences. The City declared the half of the gate on plaintiffs' side of the property line to be illegal

27    and required that it be removed while allowing the matching half of the gate on the neighbor's

28    property to remain;

Second Amended Complaint                    Page 8 of 21

1         (ii) In contrast to its treatment of plaintiffs' back yard where the City required

2 a laser site survey, and extremely detailed drawings for permits; illegal construction of an accessory

3 building in the backyard of 3011 Marina Drive required only a one page home drawn line drawing to

4 obtain City approval.  Moreover, the City ignored construction by the 3011 neighbors which was

5 shown to cross their property line with 3017 while demanding full (and excessive) setback

6 compliance by plaintiffs;

7

8         (iii) The City required plaintiffs to obtain a United States Army Corps of

9 Engineer's license for their construction onto the Oakland estuary at the rear of their property, while

10 not requiring such license for the neighbors at 3011 Marina Drive;

11

12         (iv) The City required plaintiffs to have the United States of America apply for

13 permits for their dock and accessory building over the Oakland estuary, while approving the

14 neighbors' similar structure on the application of the neighbors;

15

16         (v) In 2001 and 2002, defendant City demanded that plaintiffs obtain a permit

17 for a fence between the properties and change its height; however, defendant City made no similar

18 demand of the neighbors, who had actually constructed the allegedly offending fence.

19

20       11.  Ultimately, the code compliance issues for the plaintiffs' main house were

21 resolved, at enormous cost to plaintiffs, but not the issues relating to the boat house, boat hoist and

22 dock.  As a result of the harassment and campaign by defendant City, plaintiffs were forced to

23 relocate and sell their home.  Plaintiffs have sustained relocation costs, a loss of value to the home of

24 approximately $300,000, and have incurred architectural and legal fees in excess of $100,000

25 dollars.

26

27       12.  Plaintiffs have been compelled to retain counsel and incur legal fees and costs in

28 connection with this action in an amount not now known with certainty and subject to proof at trial.

SECOND CLAIM FOR RELIEF - 42 U. S. C. 1983

FOURTEENTH (FOURTH) AMENDMENT CLAIM

(Plaintiff Mohlen Only)

13.  Plaintiffs incorporate the allegations of their first claim for relief as if they were here set forth in haec verba.

14.  As alleged in paragraph 5(vii), supra, defendants  arrested plaintiff Mohlen and charge her with 19 misdemeanors for alleged code violations in June, 2003.  Not only were all of these counts based upon illegally adopted ordinances, the decision by the City to file these charges was part of its retaliatory scheme intended to dissuade plaintiffs from exercising their first amendment rights as described above.  Both of the individual defendants authorized and promoted the action of the City in initiating and prosecuting the criminal action.

Illegally Adopted Codes

15.  The misdemeanor complaint was based upon violation of various building codes adopted by the City of Alameda, all of which were void because they conflict with State law.  All defendants knew of the invalidity of the ordinances at all times relevant to this complaint.

16.  California's State Building Standards Law requires that the State of California adopt building standard(s), promulgate administrative procedures applicable to the implementation and enforcement of such building standards and publish such building standards and procedures in the California Building Standards Code.  This Code is to be enforced by the State of California through the Department of Housing and Community Development.  California Health and Safety Code Sections 17920-17921, 18909 and 18935-18944.5 et seq.  Pursuant to this authority, the State of California has adopted various versions of the California Building Code, California Electrical Code, California Plumbing Code, California Plumbing Code, California Fire Code, California

1   Historical Building Code, California Code for Building Conservation and the California Referenced

2   Standards Code.  These codes, which have been revised from time to time, set out the legally

3   enforceable building codes in the State of California.

4

5        17.  California law allows cities to enact ordinances imposing the same requirements

6   as are published in the California Building Standards Code or the other regulations adopted pursuant

7   to Health and Safety Code Section 17922, and permits cities to modify or change those standards

8   only upon express findings that such modifications are reasonably necessary because of local

9   climatic, geographical or topographical conditions.  These modifications are only effective when

10  they have been filed with the California Building Standards Commission.  In the event a city does

11  not adopt the same requirements as the California Building Standards Code, or fails to modify that

12  code as provided by law, the provisions published in the California Building Standards Code are

13  applicable to the city.  California Health and Safety Code Sections 179200, 17958, 17958.5,

14  17958.7, 18941.5.

15

16       18.  Defendant City adopted by ordinance building codes which do not impose the

17  same requirements as are published in the California Building Standards Code, and it failed (1) to

18  enact any ordinance modifying the California Building Standards Code for Alameda (2) make the

19  express findings as required by law to justify any deviation from the California Building Standards

20  Code and (3) file its changes and modifications to the California Buildings Standards Code with the

21  California Building Standards Commission.

22

23       19.  Rather than enact an ordinance imposing the same requirements as are published

24  in the California Building Standards Code, the City of Alameda enacted Ordinance No. 27888, and

25  predecessor ordinances, under which it adopted various "model codes," including: the Uniform

26  Administrative Code, 1997 published by the International Conference of Building Officials, the

27  Uniform Building Code, 1997 edition, published by the International Conference of Building

28  Officials, the Uniform Code for Building Conservation 1997 edition, published by the International

1    Conference of Building Officials, the National Electric Code, 1996 edition, published by the

2    National Fire Protection Association, the Uniform Plumbing Code, 1997 edition, published by the

3    International Association of Plumbing and Mechanical Officials, the Uniform Mechanical Code,

4    1997 edition, published by the International Conference of Building Officials, the Uniform Housing

5    Code, 1997 edition, published by the International Conference of Building Officials, the Uniform

6    Code for Abatement of Dangerous Buildings, 1997 edition, published by the International

7    Conference of Building Officials, the Uniform Fire Code, 1997 edition (partial) and the Uniform Fire

8    Code Standards 1997 edition, published by the International Fire Code Institute.

9

10          20.  There exist substantial differences between the provisions contained in the

11   privately compiled "model codes" and the provisions published in the California Building Standards

12   Code compiled and published by the State of California pursuant to Health and Safety Code Sections

13   17922 and 18925 et seq.  Further, there are substantial differences between the provisions published

14   in the California Building Standards Code and the local provisions added by ordinances such as

15   Ordinance No. 2788.

16

17          21.  Defendant City of Alameda had building code ordinances which differed from

18   the California Building Code Standards up until April 2, 2003 when it adopted ordinance no. 2898,

19   which adopted the California Building Standards Code and made modifications to it.  Even then,

20   however, defendant City failed to file its changes to the California Building Standards Code with the

21   California Building Standards Commission so that this ordinance continued to place illegal

22   requirements on buildings.  The ordinances and recitations of codes set out above is illustrative, and

23   at various times other editions of codes have been adopted by other ordinances, but all suffer from

24   the same defect of non-compliance with the California Building Standards Code.

25

26          22.  Because none of the City of Alameda ordinances setting building standards

27   complied with law, none of them were subject to enforcement, and the true applicable building codes

28   for the City of Alameda are those contained in the California Building Standards Code and no other.

23.  In the misdemeanor complaint against defendant Mohlen, which was authorized and recommended by the individual defendants and commenced and prosecuted by defendant City, all of the allegations arise from the illegally adopted codes.

24.  Defendants had no reasonable basis to believe that their illegally adopted codes were lawful under State law.  Further, because of the conflicting state and local codes, and the fact that many of the local codes reference uniform or model codes, and some of those codes reference other codes, the totality of the code enforcement law in the City of Alameda is so confusing, muddled, contradictory and complex as to deny substantive and procedural due process.

25.  The acts of defendants in prosecuting the misdemeanor complaint deprive plaintiff of her rights under the fourteenth amendment of the Constitution of the United States, and in particular, those rights derived from the fourth amendment to be free from arbitrary arrest and prosecution, and her rights to substantive and procedural due process.

26.  As a proximate result thereof, plaintiff Mohlen has been damaged by the infamy of arrest and prosecution, and for costs of defense, the amounts of which to be proven at trial.

THIRD CLAIM FOR RELIEF - 42 U. S. C. 1983

EQUAL PROTECTION CLAIM

27.  Plaintiff realleges paragraphs 1-26 above.

28.  By the foregoing acts, each of the defendants, acting under color of law, has violated the rights of plaintiffs to equal protection under the law

29.  Plaintiffs have been damaged as set forth in the first and second claims for relief.

1

FOURTH CLAIM FOR RELIEF – 42 U. S. C. 1983

2

REFUSAL TO PROCESS PERMIT APPEAL

3

4      30.  The allegations in this claim for relief are made both against the City of Alameda,

5  as reflective of policy adopted by the City, and against Building Official Gregory J. McFann and

6  Building and Planning Director Gregory Fuz, who directly did the acts alleged herein.

7

8      31. As a result of a meeting between plaintiffs' counsel and the City in September,

9  2002, defendant City agreed to allow certain work on the premises to proceed to obviate ongoing

10  safety hazards.  In order to accomplish this, the City reopened previously expired permit applications

11  to provide a legal framework for plans and inspections for this work.  However, the City never

12  actually approved these reopened permit applications and never denied them either.   The failure to

13  approve the permits constituted a denial of them.

14

15      32.  In June, 2003, in order to have the matter heard by the appropriate city appeal

16  board, and pursue their administrative remedies, plaintiffs attempted to lodge an appeal with respect

17  to these permits with the City Building Official, Gregory J. McFann.  Defendant McFann took the

18  paperwork from plaintiffs but refused to allow them to pay the fees necessary for the appeal.

19

20      33.  Defendant City, by and through its Building Official, defendant Gregory J.

21  McFann, and its then Planning and Building Director, defendant Gregory Fuz, refused to process or

22  accept the appeal, thereby denying plaintiffs the opportunity to present their case to City officials

23  who are empowered to grant the permits needed to complete work on their premises.  Defendant

24  Planning and Building Director Gregory Fuz wrote to plaintiffs that the City refused to process the

25  appeal, and contended that it was untimely.  In fact, (1) the appeal was timely and (2) in any event

26  the timeliness is not to be decided by the Planning and Building Director, but by the reviewing

27  authority.

28

34.  Defendants McFann and Fuz, by their actions, denied plaintiffs their rights under local ordinance to appeal the denial of their permits and obtain a decision thereon by the legally constituted review body.

35.  As a proximate result, plaintiffs have been damaged by the loss of value in their property, by the incurring of additional architectural and legal fees to cause City records to reflect the legal status of their property, and by an inability to perform the improvements to the property described in the permit applications.

FIFTH CLAIM FOR RELIEF

DENIAL OF DUE PROCESS IN THE COLLECTION OF FINES

36.  The acts alleged in this claim for relief apply against the City of Alameda only.

37.  The City of Alameda Municipal Code Section 304.5.2, in Section 13-1-2 modifies the provisions of the Uniform Administrative Code promulgated by the International Conference of Building Officials, by setting out a "penalty fee."  The section provides:

> Any person, firm or corporation that commences any construction without first having obtained the necessary permits shall, if subsequently permitted to obtain a permit, pay an amount, in addition to the ordinary permit fee, as established by the City Council.

This section was operative until April 2, 2003, and applies to the penalties paid by plaintiffs as alleged herein.  This ordinance is, and at all times relevant, was illegal for the reasons set out in paragraphs 15-22, above.  Similar penalty provisions apply since April 2, 2003.  Penalty provisions include, for example, an "investigation" fee equal to four times the permit fees for code enforcement complaints.

38.  Defendant City of Alameda Building and Planning Department, responding to

shortfalls in municipal government revenues, commenced an aggressive series of enforcement actions against building owners in the City of Alameda commencing in approximately 2001.  Those enforcement actions have been characterized by:

i.  Fully 50% of the buildings constructed in the City of Alameda are a half century or more old.  Less than 7% of the buildings in Alameda have been constructed since plaintiffs purchased their residence on Marina Drive in 1994.  Because the housing stock is old, most of it does not meet present day building and planning codes.  Generally, as building and planning codes have been upgraded, they have applied only to new construction and remodeling.

ii.  The City of Alameda has had variable practices in past years concerning the documentation of building construction and permits.  In past years, for example, on permitted construction, changes in the field were made which deviated from approved plans.  Defendant City regularly delegated the ability to approve construction deviations to inspectors in the field, and they did so, without any requirement that the construction plans on file with defendant City be changed.  Further, defendant City did not retain any construction plans for residential structures prior to World War II, and more than one third of the residential structures in the City were constructed prior to that time.

iii.  With respect to property along Marina Drive in Alameda, in particular, defendant City has allowed accessory buildings, such as boathouses, to be built without requiring permits, and without requiring any plans at all, until at least the 1960's.

iv.  As time progressed, the City required ever more detailed drawings and documentation for buildings.  However, even during the 1990's, the City of Alameda would issue electrical permits without drawings, but simply based upon the applicant stating and paying for the appropriate number of receptacle, switches, etc.

1    v. As a result of this history, defendant City of Alameda has poor quality

2  records of permitted building construction.

3

4    vi. Commencing in approximately 2001, defendant City, in an effort to raise

5  money for its building and planning department, commenced wide scale building and planning code

6  enforcement proceedings. Over 1200 buildings, which is a significant percentage of the total number

7  of structures in Alameda, have been subject to these enforcement proceedings. In recent years,

8  enforcement inspections have been 10% of total building inspections. Enforcement proceedings

9  provide added revenue for defendant City because they result in permits, with associated fees, plan

10  checking, with associated fees, and investigation and penalty fees. Further, as part of the

11  enforcement actions, defendant City requires that properties be brought up to current code, including

12  seismic requirements, and require that the plans on file with the City match the actual structure, in

13  far greater detail than ever required in the past. Since the City has inadequate or no plans at all for

14  many of the structures in the City, the enforcement program results in huge documentation

15  requirements for allegedly offending structures, and substantial fees for the City to review those

16  plans.

17

18    39. Defendant City falsely claims not to know the amount of money it has

19  collected under and through its code enforcement program, and has refused to disclose the amounts

20  collected to counsel for plaintiffs. In truth, however, the City purchased code compliance software

21  from Accela Corporation and therefore has state of the art accounting for code compliance despite its

22  claims of ignorance. Defendant City has refused to produce for inspection the manuals for the

23  operation of that software, which would prove the extent of its reporting capabilities. In the claimed

24  absence of precise data, however, plaintiffs estimate that a substantial percentage of the total permit,

25  planning and inspection fees, and hence, a substantial percentage of the total employee time in the

26  building and planning department, are spent on these code enforcement ventures, based upon the

27  report by the City that 10% of all inspections are for code enforcement, since code enforcement

28  activity is far more profitable than ordinary building and planning permitting activity.

Second Amended Complaint          Page 17 of 21

40. The implementation of the code enforcement program has been used, not merely for those legitimate health and safety purposes for which it is intended, but to forestall layoffs in the planning and building staff among the employees responsible for the code enforcement program. The code enforcement program is conducted under the specific supervision of defendant Gregory McFann, who is the Chief Building Official of defendant City, and the Building and Planning Director, who, until 2004, was defendant Gregory Fuz. Further, although defendant City claims that it only engages in code enforcement activity when it receives complaints from City residents, many code enforcement complaints are generated by city employees for the purpose of securing their continued full time employment.

41. It has been the practice of the City of Alameda to enforce the code enforcement penalty fees whether or not the offender is subsequently permitted to obtain a permit to rectify the claimed offending condition. Plaintiffs have been assessed thousands of dollars of such fees.

42. The penalty fees are assessed by the Building Official and the Planning and Building Director, who also are responsible for ascertaining that the violation has occurred. The City Council has no authority to overrule the Building Official on code compliance issues. There is, therefore, a significant financial interest by the Building Official, in maximizing these penalties in order to fund his department and the code enforcement function.

43. The failure to have an independent tribunal or decision maker responsible for assessment of the fines violates the civil rights of plaintiffs because it denies them due process and equal protection of law. *Ward v. City of Monroeville*, 409 U.S. 57 (1972). Plaintiffs are, accordingly, entitled to a refund of all such fees paid within the three years prior to the commencement of this action, and for their attorneys' fees incurred in this action.

SIXTH CLAIM FOR RELIEF - 42 U. S. C. 1983

INJUNCTION CLAIM AGAINST DEFENDANT CITY ONLY

44.  Plaintiffs reallege the second and fourth claims for relief as if they were here set forth in haec verba.

45.  Defendant City has a code enforcement program which seeks to penalize, both civilly and criminally, homeowners who have not complied with building codes and planning ordinances.

46.  For the reasons set forth in the second claim for relief, the City building codes are void, and have been for many years.

47.  Unless restrained by this Court, defendant City will continue to penalize homeowners for having violated these void ordinances.  An injunction is required to prevent a multiplicity of actions, and avoid irreparable harm to homeowners who may have their property title impaired by code enforcement actions.

48.  Plaintiffs therefore request this Court to enjoin building and planning code enforcement actions by defendant City, and to permanently prohibit it from imposing any civil or criminal penalties upon homeowners for construction which occurred during the time when the City failed to follow State law in connection with its building and planning ordinances.

49.  Plaintiffs have incurred legal expenses in connection with this claim for relief, and because the claim imposes a large public benefit, request the Court to award them their costs of suit and attorneys' fees.

Second Amended Complaint                    Page 19 of  21

PRAYER FOR RELIEF

Wherefore, plaintiffs pray for relief as follows:

1. For compensatory damages according to proof, or in the amount of $750,000;

2. For punitive damages in the sum of $100,000 against each of the personal defendants herein, or according to proof;

3. For attorneys fees and court costs in the amount of $250,000 or according to proof;

4. For an order enjoining the City and all defendants from harassing or intimidating citizens who provide testimony, evidence, or public comments supportive of plaintiffs in their dispute with defendant City;

5. For a temporary restraining order, preliminary injunction and permanent injunction restraining defendant City from imposing any civil or criminal penalty on any person for violation of building and planning codes during the time when such codes in the City of Alameda did not comply with State law, and from commencing any enforcement proceeding based upon building which occurred during that same time;

6. For an order that the City refund all fees collected from plaintiffs;

7. For prejudgment interest on the foregoing sums; and

8. For such other and further relief as the court deems just and proper.

Dated:  September 9, 2005

_____
Laurence F. Padway
Attorney for plaintiffs

Second Amended Complaint                    Page 20 of  21

1                                   Proof of Service

2               I, Laurence F. Padway, hereby declare under penalty of perjury that:

3               I am one of the attorneys for plaintiffs herein.

4               On _____, I served the foregoing Second Amended Complaint by mail as
   follows:

5
   Gregory M. Fox, Esq.
6  Bertrand, Fox & Elliott
   The Waterfront Building
7  2749 Hyde Street
   San Francisco, CA   94109

8
   Carol A. Korade, Esq.
9  City Attorney
   City of Alameda - City Hall
10 2263 Santa Clara Avenue, Room 280
   Alameda, CA 94501

11
               Executed this ___ day of October, 2005 at Alameda, California.

12

13
                              _____
14                            Laurence F. Padway

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10

11   RITA MOHLEN and ,                       Case No. C 03 3162 CW
     RICHARD SKRINDE

12                                           (Proposed) ORDER FOR FILING
           Plaintiffs,                       SECOND AMENDED
13       vs.                                 COMPLAINT

14   CITY OF ALAMEDA, GREGORY
     McFANN, and GREGORY FUZ,

15         Defendants.

16   _____/

17

18         Good cause appearing and on stipulation of the parties, plaintiffs may file the Second

19   Amended Complaint attached to the Stipulation of counsel.

20

21

22

23         Dated: 10/12/05

24

25

26                                           _____
                                             Hon. Claudia Wilken
27                                           United States District Judge

28

     Stipulation to Amend              Page 3 of 3